EXHIBIT A

 

# EDUCATIONAL SERVICES PLATFORM STRATEGIC DEVELOPMENT, LICENSING, & COOPERATION AGREEMENT

between

## Indiana Wesleyan University and Olé Holdings, Inc.

This EDUCATIONAL SERVICES PLATFORM STRATEGIC DEVELOPMENT, LICENSING, & COOPERATION AGREEMENT (this "Agreement") is made and entered into as of April 15th, 2020 (the "Effective Date"), between Olé Holdings Inc. ("OLE"), a Delaware company (the "Licensor"), and Indiana Wesleyan University ("IWU"), an Indiana not for profit corporation, on behalf of its National & Global unit ("N&G") (the "Licensee," and together with the Licensor, the "Parties" and each a "Party").

## RECITALS

WHEREAS, OLE has an advanced Educational Services Platform (ESP) that is a set of integrated educational, operational, and deployment services that instantiates a complete digital educational system that has capabilities far beyond the discrete educational components that are typically used in online education today;

WHEREAS, The Ministry of Science & Higher Education (MoSHE) of the Federal Democratic Republic of Ethiopia (FDRE) has formally accepted OLE's Educational Services Platform (ESP) as a world-class, integrated, and harmonized educational platform that will align the country's educational efforts with the UN AGENDA 2030 Ethiopian Education Sector Technical Roadmap;

WHEREAS, the FDRE Civil Service Commission (CSC) has also approved and signed an LOI to implement OLE's platform to train government workers;

WHEREAS, OLE & MoSHE have agreed to a pilot program that will include 11 of Ethiopia's largest universities, prior to a full deployment with remaining 38 MoSHE universities;

WHEREAS, IWU is one of the worlds most experienced online universities; 23 years of online development with hundreds of online courses and 90+ degree programs;

WHEREAS, IWU desires to launch its university online services within Ethiopia to support various business models including: IWU Online in Ethiopia, Assisting MoSHE Universities with content development, helping international corporate entities with their training of their Ethiopian workforce, and assisting CSC with the development of Ethiopia's civil servants;

WHEREAS, OLE & IWU desire to work together on the next generation of ESP and its LMS ready for worldwide deployment;

**AGREEMENT**

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and agreements herein contained and for other good and valuable consideration, the Parties agree as follows:

**DEFINITIONS**

Definitions. The following terms shall have the meanings set forth below:

"Country License List" means the list of countries in which the Licensee is licensed to deliver its educational programs using the Educational Services Platform. The Country License List can be amended together with this agreement and is attached as **Schedule C** to this agreement.

"Country Readiness Plan" means readiness plan that would be developed in preparation of supporting a new country with ESP; it would include elements such as language, local billing, local carrier integration, and others.

"Delivery Date" means the date that the OLE Educational Services Platform is active and ready for N&G online delivery of educational and training courses.

"Documentation" means any written, printed or otherwise recorded or stored material that relates to the platform, including technical specifications, source code annotations, training and support materials, descriptions of the principles of operation of source code, other instructions.

"Educational Services Platform" or "ESP" means (a) the Licensor's educational software platform (in both source code and object code form), as it exists on the Delivery Date, (b) the Components, (c) the Documentation, (d) Improvements to the platform, the Components or the Documentation, as each were made by or on behalf of Licensor prior to the Delivery Date, and (e) any Improvements to ESP, the Components or the Documentation that were made available by Licensee to Licensor pursuant to Section 2.4 below.

"ESP Marketplace and Expanded licensing" means (a) the Licensor's ESP software platform with adaptations from the Country Readiness Plan that the Parties would work on together and would be licensed in order to open up a new country or region.

"ESP Partner Module" means the extended functionality that allows the ESP interfaces to be white labeled for Licensee partners in the course of conducting Licensee Business.

"Improvement" means any invention, modification, addition, derivative work, enhancement, revision, translation, abridgment, or expansion to or arising from a work, or any other form in which a work or any part thereof, may be recast, transformed, or adapted.

"Intermediate ESP Modules" means the ESP software components that OLE delivers to N&G prior to the Delivery Date for the purpose of testing, data migration, and preparation of content so that N&G can be ready on the Delivery Date.

"Licensee Business" means the business of being a university, educating and training the worlds workforce; It does not include any other business or revenues that the ESP might be licensed for to other parties.

"Licensee Partners" means the set of customers that the licensee partners with to offer its services directly or as a white labeled service. Frequently, these partners have training and courses of their own that can be used in combination with the licensee's content and courses. Licensee Partners are NOT in the Licensee Business themselves.

"Licensor Intellectual Property" means any existing or hereafter acquired or arising Intellectual Property that is now or hereafter owned by or licensed to Licensor and that is embodied in or protects the Educational Services Platform; provided that, in the case of any such Intellectual Property that is licensed to Licensor from a third party, such Intellectual Property will be included in the Licensed Intellectual Property only to the extent that Licensor has the right to sublicense such Intellectual Property to Licensee within the scope of the license granted hereunder. For the avoidance of doubt, "Licensor Intellectual Property" includes all Intellectual Property owned by Licensor that is used in the Business on or before the Closing Date and that does not constitute a Purchased Asset.

# ARTICLE I
## N&G AND OLE STRATEGIC COOPERATION

Section 1.1 <u>Strategic Cooperation with the Ethiopian University Pilot (EUP) program</u>. OLE has invited N&G to officially participate in the EUP program as an experienced advisor. N&G's 23 plus years of online course development and learnings will be incorporated into the system.

(a)    <u>Joint Participation in the EUP Requirements</u>. Together the Parties will work to optimize a world-class set of product requirements to be implemented in the pilot program.

(b)    <u>Participation in EUP meetings</u>. N&G will be invited to participate in the EUP meetings where product decisions and requirements are being discussed.

(c)    <u>Visiting Pilot Universities</u>. N&G will have the opportunity to meet the pilot universities and visit them together with OLE.

Section 1.2 <u>Work together on identified business models, partnerships, and funding</u>. The parties will work together to build the identified business models through the relationships already developed by OLE in Ethiopia.

(a)    <u>N&G Direct Access to Ethiopian Students</u>.

(b)    <u>Partnering with Ethiopian Universities to offer N&G Programs</u>.

(c)    <u>Blended Corporate/IGO Initiatives such as internships, "pathway to employment" and sponsorship for students.</u>

(d)    <u>Local corporate training with US-based companies needing "talent ladder" or specific, advanced and customized education initiatives.</u>

(e)    <u>Support Ethiopian Civil Servant Leadership Development</u>.

(f)    Cooperation on a local Ethiopian office.

(g)    Continue to work together with the CEO Forum to find strategic partnerships and funding.

(h)    Continue to work together on IGO opportunities such as "Prosper Africa".

Section 1.3 <u>First mover status for new countries</u>. OLE agrees to align to N&G international growth priorities and will respond to timing and implementation when N&G provides the priority list. N&G priority alignment will and priority listing will be in effect for a full year from the signing of this agreement. No alignment will be considered binding until an amendment to this agreement is signed.

## ARTICLE II
## OLE SOFTWARE LICENSE'S

Section 2.1 <u>License Grant</u>. Subject to the terms and conditions of this Agreement, Licensor hereby grants to Licensee, (a) a nonexclusive, irrevocable, non-sublicensable, non-transferable (except as permitted in Section 8.9), right and license to use in the approved Country License List (i) to use and exploit the Licensor Intellectual Property and (ii) to use, display, install, copy, or otherwise exploit the Educational Services Platform, the Intermediate ESP Modules, and the ESP Partner Module, in each case, solely in connection with the operation of the Licensee Business. Except as provided otherwise in Sections 2.1, 2.2, or 8.9, Licensee and Licensee's Affiliates may not disclose to or provide any third-party access to, use of, or rights in or to, the ESP or any Licensor Intellectual Property, except as Licensee Partners may access or use the platform in relation to the Licensee Business in the ordinary course of business.

Section 2.2 <u>Educational Services Platform and ESP Partner Module Licensing Fees</u>. The Educational Services Platform license fee is three million, five hundred thousand dollars ($3,500,000.00). This fee is inclusive of all initial customization services completed and accepted prior to the Delivery Date. The ESP Partner Module license fee is one million, five hundred thousand dollars ($1,500,000.00). This fee is inclusive of all initial customization services completed and accepted prior to the Delivery Date.

Section 2.3 <u>ESP and ESP Partner Module – Updates, Maintenance, & Support Fees</u>. The Updates, Maintenance, and Support Fees is calculated as 18% of the licensing fee of each product licensed. The annual fee for the Educational Services Platform is therefore six hundred, and thirty thousand dollars ($630,000.00). The annual fee for the ESP Partner Module is therefore two hundred, and seventy thousand dollars ($270,000.00). The Licensee is only responsible for a total of two hundred and fifty thousand dollars ($250,000.00) of fees directly with the rest coming from partnerships and fundraising expected to be raised. These fees commence on the Delivery Date and are payable in quarterly installments.

Section 2.4 <u>Access to Updates</u>. From the Delivery Date, Licensor shall disclose to Licensee any updates to the Educational Services Platform to which Licensee may incorporate into the Licensee's environment as and if desired and at Licensee's discretion and risk.

Section 2.5 <u>Ownership</u>. Subject to the terms hereof and the licenses granted hereunder, Licensor will have and retain sole and exclusive ownership of, and all right, title and interest in, the Educational Services Platform, the Intermediate ESP Modules, and  Licensor Improvements, and Licensee shall have no right, license or interest therein.

Section 2.6 <u>Disclosure of Improvements and Developments</u>. Other than as provided in Section 2.4 above, Licensor will have no obligation to disclose to Licensee any Licensor Improvements that do not impact licensee experience.

Section 2.7 <u>Payment Terms</u>. Licensee shall pay five hundred thousand dollars ($500,000.00) to Licensor in two equal payments of two hundred fifty thousand dollars ($250,000.00). The first payment shall occur upon full execution of this agreement, and the second payment shall occur on/around June 10, 2020. The remaining four and a half million dollars ($4,500,000.00) of licensing and development needed under the agreement would be paid through joint fund-raising between IWU and OLE and would be paid out upon receipt of such funds. In the event the joint fund-raising between IWU and OLE exceeds five million dollars ($5,000,0000.00), the Parties agree to share the excess with each receiving fifty percent (50%).

Section 2.8 <u>Acknowledgements</u>. Licensee acknowledges and agrees the Licensor is not in the business of broadly commercially licensing the Educational Services Platform or providing any broadly available services relating to the platform to third parties and that the platform may contain errors. LICENSOR SHALL NOT HAVE ANY DUTIES OR RESPONSIBILITIES UNDER THIS AGREEMENT OTHER THAN THOSE SPECIFICALLY SET FORTH IN THIS AGREEMENT AND NO IMPLIED OBLIGATIONS SHALL BE READ INTO THIS AGREEMENT. LICENSOR RETAINS ALL RIGHT, TITLE, AND INTEREST IN AND TO THE PLATFORM NOT EXPRESSLY LICENSED UNDER THIS AGREEMENT.

**ARTICLE III**
**SERVICES AGREEMENT**

Section 3.1 <u>Development, Consulting, Hosting Services, Support, and Training</u>.

(a)    <u>Initial customization development of ESP for N&G</u>. OLE will develop to the requirements of the Statement of Work to complete Educational Services Platform ready for Ethiopian distribution, local devices, billing, and other features listed in **Schedule A**. The fees for this development is included in the licensing fees in section 2.2.

(b)    <u>Future Development Consulting Fees</u>. For development assistance beyond those contemplated in this agreement, the Licensor will charge standard (most favored) rates for development and integration services. OLE will provide a proposal estimate upon request.

(c)    <u>AWS Cloud Hosting</u>. If requested, OLE will provide AWS Cloud Hosting and associated cloud management for the Licensee. The fee for Hosting would be cost +12% of the billing of the AWS services to N&G.

(d)    <u>Local Ethiopian Hosting</u>. If requested, and if made available to OLE, OLE will provide hosting services to N&G connected to the Ethiopian MoSHE WAN. This hosting would provide better up-time within the country since it would circumvent any Ethiopian internet disruption. OLE will present this option to N&G if and when it becomes available.

(e)    <u>ESP Support Included in Annual Updates, Maintenance, & Support Fee</u>. The Licensor will support N&G according to the Technical Support Plan in **Schedule B** herein.

(f)    <u>Development Related Travel Expenses</u>. Licensee shall pay Licensor for travel related expenses during the term of this agreement that occur on the behalf of Licensees integration, development, and product requirement specification. Licensor must receive approval for any travel related fees prior to incurrence of such fees.

**ARTICLE IV**
**REPRESENTATIONS AND WARRANTIES**

Section 4.1 <u>Licensor Representation and Warranties</u>. Licensor:

(a) Represents to Licensee that Licensor has the full right, power and authority, including the necessary Intellectual Property rights, to enter into this Agreement, to undertake the transactions contemplated hereby and to grant the licenses granted herein;

(b) Represents and warrants to Licensee that Licensor's grant of the license and rights to Licensee hereunder does not, and will not infringe or misappropriate any third party's tangible property rights, Intellectual Property rights existing on the Effective Date, or personal rights and Licensor has not received any notice or claim on or before the Effective Date asserting that the Platform infringes or misappropriates, suggesting that the Licensor, due to its use or exploitation of the Platform, consider licensing, or demanding that the Licensor license, from any person, or refrain from using, any Intellectual Property of a third party, nor to the knowledge of the Licensor is there reasonable basis therefore;

(c) Represents to Licensee that neither the ESP nor any Licensor Intellectual Property is subject to any litigation, judgment, decree, stipulation, or other dispute as of the Effective Date, nor to the knowledge of Licensor is any such dispute threatened;

(d) Represents and warrants to Licensee that no third parties hold or have been granted by Licensor intellectual property rights in the ESP or Licensor Intellectual Property that would conflict with the rights granted to Licensee herein or which does, or with the passage of time, or exercise of an option or springing right, would materially adversely affect the rights granted to Licensee hereunder;

(e) Represents to Licensee that the rights granted under Section 2.1 hereof and the materials delivered under Section 2.3 hereof constitute all of the rights and materials necessary to operate the ESP (including rights with

respect to software licensed from third parties) as such ESP has been operated by Licensor during time prior to the Delivery Date;

(f) Represents to Licensee that, as of the Effective Date, no use of open source software code in connection with ESP or integration of open source software code into the platform has triggered any requirement that (i) the source code to the platform be publicly disclosed or (ii) that the platform has become open source;

(g) Warrants to Licensee that Licensor has used commercially reasonable efforts to prevent the introduction of, and to the knowledge of Licensor, the platform does not contain any, software viruses, time or logic bombs, trojan horses, worms, timers or clocks, trap doors or other malicious computer instructions, devices or techniques in the platform as delivered to Licensee pursuant to Section 2.3;

 (i) Represents to Licensee that the source code and Documentation delivered to Licensee pursuant to Section 2.3 is consistent with the source code and Documentation used by Licensee for its internal purposes;

(j) EXCEPT AS EXPRESSLY SET FORTH ABOVE, THE HOSTED TRAINING PLATFORM AND RELATED LICENSOR INTELLECTUAL PROPERTY AND SERVICES ARE PROVIDED ON AN AS IS, WHERE IS, WITH ALL FAULTS BASIS AND WITHOUT ANY WARRANTY OF ANY KIND, EXPRESS OR IMPLIED, INCLUDING ANY WARRANTY OF MERCHANTABILITY, INTEROPERABILITY, OR FITNESS FOR ANY PARTICULAR PURPOSE OR NON-INFRINGEMENT.

**ARTICLE V**
**TERM AND TERMINATION**

Section 5.1 Term. The term of this Agreement is five years and shall renew each year thereafter as long as the Updates, Maintenance, & Support Fees payment is received by Licensor.

Section 5.2 No Termination by Licensor. The licenses granted hereunder shall be irrevocable, shall not be terminable by Licensor and shall continue in full force and effect, provided, however, if Licensee materially breaches its obligations under this Agreement by disclosing the source code or Documentation to an unauthorized third party or by not paying the fees owed under section 3.1, then Licensor may bring a legal action against the Licensee seeking (i) injunctive relief to prohibit such action (or a reoccurrence of the same or similar breach), but not injunctive relief to prohibit Licensee's own use of the platform or Documentation in accordance with this Agreement, and (ii) monetary damages.

Section 5.3 Termination by Licensee. Should the Licensee terminate the agreement, the Licensee is responsible for unpaid fees and expenses due for that annual period. Should the Licensee terminate the agreement, the license grant in Section 2.1 will also be terminated. If Licensor materially breaches its obligations under this Agreement then Licensee may bring a legal action against the Licensor seeking (i) injunctive relief to prohibit such action (or a reoccurrence of the same or similar breach) and (ii) monetary damages.

Section 5.4 Termination by Either Party. It shall not be considered a material breach of contract if the Parties, despite their best efforts, fail to meet their joint fund-raising expectations outlined in Section 2.7. In the event such occurs, either Party may terminate this agreement for any or no reason with ninety (90) days written notice to the other.

**ARTICLE VI**
**LIMITATION ON LIABILITY**

Section 6.1 DAMAGE DISCLAIMER. EXCEPT AS PROVIDED BELOW IN THIS ARTICLE VI, IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR ANY CONSEQUENTIAL, INDIRECT, INCIDENTAL, PUNITIVE, OR SPECIAL DAMAGES WHATSOEVER, INCLUDING WITHOUT LIMITATION, DAMAGES FOR LOSS OF BUSINESS PROFITS, BUSINESS INTERRUPTION, LOSS OF BUSINESS INFORMATION, AND THE LIKE, ARISING OUT OF THIS AGREEMENT, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

Section 6.2 <u>GENERAL DAMAGE CAP</u>. EXCEPT AS PROVIDED BELOW, IN NO EVENT SHALL EITHER PARTY BE LIABLE IN THE AGGREGATE UNDER THIS AGREEMENT OR WITH RESPECT TO THE PLATFORM OR LICENSOR INTELLECTUAL PROPERTY FOR ANY DAMAGES OR LOSSES IN EXCESS OF: (A) FOR CLAIMS ARISING BEFORE THE 24TH MONTH AFTER THE EFFECTIVE DATE, THE AMOUNT INVESTED IN THE PROJECT AS OF THAT DATE OR (B) FOR CLAIMS ARISING ON OR AFTER THE 24TH MONTH AFTER THE EFFECTIVE DATE, TWO HUNDRED AND FIFTY THOUSAND DOLLARS ($250,000.00).

Section 6.3 <u>INDEMNIFICATION</u>. EACH PARTY HEREBY AGREES TO INDEMNIFY, DEFEND AND HOLD HARMLESS THE OTHER PARTY, ITS AFFILIATES, AND THEIR RESPECTIVE DIRECTORS, EMPLOYEES AND AGENTS FROM AND AGAINST ANY AND ALL THIRD PARTY SUITS, CLAIMS, ACTIONS, DEMANDS, LIABILITIES, EXPENSES AND/OR LOSSES, INCLUDING REASONABLE LEGAL EXPENSES AND REASONABLE ATTORNEYS' FEES ("LOSSES") TO THE EXTENT SUCH LOSSES RESULT FROM ANY: (A) BREACH OF WARRANTY BY THE INDEMNIFYING PARTY CONTAINED IN THE AGREEMENT; (B) BREACH OF THE AGREEMENT OR APPLICABLE LAW BY SUCH INDEMNIFYING PARTY; (C) NEGLIGENCE OR WILLFUL MISCONDUCT OF THE INDEMNIFYING PARTY, ITS AFFILIATES OR (SUB)LICENSEES, OR THEIR RESPECTIVE DIRECTORS, EMPLOYEES AND AGENTS IN THE PERFORMANCE OF THE AGREEMENT; (D) CRIMINAL INVESTIGATIONS OF, DEFENSE OF CRIMINAL CHARGES AGAINST, AND CRIMINAL PENALTIES LEVIED ON, SUCH PARTY, ITS AFFILIATES, AND THEIR RESPECTIVE DIRECTORS, EMPLOYEES AND AGENTS; AND/OR (E) BREACH OF A CONTRACTUAL OR FIDUCIARY OBLIGATION OWED BY IT TO A THIRD PARTY (INCLUDING MISAPPROPRIATION OF TRADE SECRETS).

## ARTICLE VII
## CONFIDENTIAL INFORMATION

Section 7.1 Each of the Parties shall hold, and shall cause its Representatives to hold, in confidence all documents and information furnished to it by or on behalf of the other party. For the entire period of this Agreement each Party shall maintain the confidentiality, of all information or data of any nature ("Information") provided to it by the any other Party hereto.

For the purposes of this Agreement any such information that may reasonably be expected to be maintained as confidential, shall be deemed proprietary. Each Party shall use the same efforts (but in no case less than reasonable efforts) to protect the Information it receives hereunder as it accords to its own Information. The above requirements shall not apply to Information which is already in the possession of the receiving Party through no breach of an obligation of confidentiality to the disclosing Party or any third Party, is already publicly available through no breach of this provision, or has been previously independently developed by the receiving Party. This Agreement shall not prevent any disclosure of Information pursuant to applicable law or regulation, provided that prior to making such disclosure, the receiving Party uses reasonable efforts to notify the other Party of the required disclosure. All Information provided by any Party to the other hereunder shall be used solely for the purpose for which it is supplied.

Neither Party shall (i) refer to itself as an authorized representative of the other Party in promotional, advertising, or other materials, (ii) use the other Party's logos, trademarks, service marks, or any variations thereof in any of its promotional, advertising, or other materials, or (iii) release any public announcements referring to the other Party of this Agreement without first having obtained such Party's Prior written consent.

## ARTICLE VIII
## MISCELLANEOUS

Section 8.1 <u>Amendment and Modification</u>. This Agreement may not be amended, modified or supplemented in any manner, whether by course of conduct or otherwise, except by an instrument in writing specifically designated as an amendment hereto, signed on behalf of each party.

Section 8.2 <u>Waiver</u>. No failure or delay of either party in exercising any right or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment

or discontinuance of steps to enforce such right or power, or any course of conduct, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the parties hereunder are cumulative and are not exclusive of any rights or remedies which they would otherwise have hereunder. Any agreement on the part of either party to any such waiver shall be valid only if set forth in a written instrument executed and delivered by a duly authorized officer on behalf of such party.

Section 8.3 <u>Notices</u>. All notices, requests, or other communications hereunder shall be in writing, addressed to the parties as follows:

If to OLE: 5106 Meadow Crest Dr., Dallas TX 75229

If to Licensee: 4201 S Washington St, Marion, IN 46953

(a)    Notices mailed by registered or certified mail shall be conclusively deemed to have been received by the addressee on the fifth business day following the mailing of sending thereof.  Notices sent telex or facsimile shall be conclusively deemed to have been received when the delivery confirmation is received. If any PARTY, wishes to alter the address to which communications to it are sent, it may do so by providing the new address in writing to the other PARTIES.

Section 8.4 <u>Interpretation</u>. When a reference is made in this Agreement to a Section, Article, Schedule or Exhibit, such reference shall be to a Section, Article, Schedule or Exhibit of this Agreement unless otherwise indicated. Any table of contents or headings contained in this Agreement or in any Schedule are for convenience of reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. All words used in this Agreement will be construed to be of such gender or number as the circumstances require. Any capitalized terms used in any Schedule but not otherwise defined therein shall have the meaning as defined in this Agreement. All Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth herein. The word "including" and words of similar import when used in this Agreement will mean "including, without limitation," unless otherwise specified.

Section 8.5 <u>Entire Agreement</u>. This Agreement (including the Schedules hereto), constitutes the entire agreement, and supersedes all prior written agreements, arrangements, communications and understandings and all prior and contemporaneous oral agreements, arrangements, communications and understandings between the Parties with respect to the subject matter hereof. If there are any conflicts between the terms and provisions of this Agreement, the terms and provisions of this Agreement shall control.

Section 8.6 <u>No Third-Party Beneficiaries</u>. Nothing in this Agreement, express or implied, is intended to or shall confer upon any Person other than the parties, their Affiliates and their respective successors and permitted assigns any legal or equitable right, benefit or remedy of any nature under or by reason of this Agreement.

Section 8.7 <u>Governing Law</u>. This Agreement and all disputes or controversies arising out of or relating to this Agreement or the transactions contemplated hereby shall be governed by, and construed in accordance with, the internal laws of the State of Texas, without regard to the laws of any other jurisdiction that might be applied because of the conflicts of laws principles of the State of Texas.

Section 8.8 <u>Assignment; Successors</u>. Neither this Agreement nor any of the rights, interests or obligations under this Agreement may be assigned or delegated, in whole or in part, by operation of law or otherwise, by either party without the prior written consent of the other party, and any such assignment without such prior written consent shall be null and void; provided, however, that the Licensee may assign this Agreement to any Affiliate of the Licensee or in connection with a sale of the assets of the Licensee that primarily relates to the Licensee Business using the platform without the prior consent of the Licensor. Following any such assignment, Licensee shall cease all use of the platform and provide Licensor notice of such assignment. Subject to the preceding sentence, this Agreement will be binding upon, inure to the benefit of, and be enforceable by, the parties and their respective successors and assigns.

Section 8.9 <u>Severability</u>. Whenever possible, each provision or portion of any provision of this Agreement shall be interpreted in such manner as to be effective and valid under Applicable Law, but if any provision or portion of any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any Applicable Law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other

provision or portion of any provision in such jurisdiction, and this Agreement shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision or portion of any provision had never been contained herein.

Section 8.10 <u>Enforcement</u>. The parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. Each of the parties shall be entitled to specific performance of the terms hereof, including an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in the State of Texas.

Section 8.11 <u>Waiver of Jury Trial</u>. EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 8.12 <u>Counterparts; Electronic Signatures</u>. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original but all of which together shall constitute one and the same instrument and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other party. A facsimile, PDF or other electronic signature of this Agreement shall be valid and have the same force and effect as a manually signed original.

Section 8.13 <u>No Presumption Against Drafting Party</u>. Each of the Licensor and the Licensee acknowledges that each party to this Agreement has been represented by legal counsel in connection with this Agreement and the transactions contemplated by this Agreement. Accordingly, any rule of law or any legal decision that would require interpretation of any claimed ambiguities in this Agreement against the drafting party has no application and is expressly waived.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

**Olé Holdings, Inc.**
a Delaware corporation

By: _Dalen Harrison_
DocuSigned by:
07E4BBB8509407
Name: Dalen Harrison  (DH)
Title: Chief Executive Officer

**Indiana Wesleyan University**
an Indiana not for profit corporation

By: _Nancy D. Schoonmaker_
DocuSigned by:
D68264 7CE51647F...
Name: Nancy D. Schoonmaker  (NS)
Title: Executive Vice President & CFO

*[Signature Page to IWU and OLE ESP License & Service Agreement]*

Schedule A – ESP Description & Statement of Work

## EDUCATIONAL SERVICES PLATFORM 2.0

As specified to Ethiopian Ministry of Science and Higher Education

URGENT Response Proposal to  MoSHE of What would be available in the Fall of 2020

## Urgent MoSHE University LMS Requirements for Fall 2020

Since Olé Holdings has been working side-by-side with the MoSHE team, the company is prepared to respond quickly to the request and implementation of a pandemic-ready Learning Management System (LMS). This is not the full ESP being considered for the Pilot Program, but it does contain the majority of the on-line Learning Management System elements specified.

## Summary of Requirements

First and foremost the needed LMS must achieve the needed functionality and scale to support all 49 of the MoSHE universities. Secondly, the LMS must adapt to the specific infrastructure needs of Ethiopian students. These are some key requirements:

**LMS Infrastructure Requirements**

- The LMS must work on-line and off-line as needed
- The LMS must work on low-end devices, phones, tablets, and computers
- The LMS Server support must be adaptable to work within the Ethiotel infrastructure, even for 2G
- The LMS must be completely secure for students, faculty, and staff usage
- The LMS must provide MoSHE with a complete analytics platform of usage of the system
- The LMS must have a simple set-up interface for each university to customize

**Content/Course Requirements**

- The LMS that must accept content standards such as "Common Cartridge"
- The LMS must have integrated communications: text, email, voice mail, video conferencing
- The LMS must have an integrated video: live video, recorded classes, video collaboration, etc.
- The LMS must have a complete instructional design portal for faculty and staff to develop courses
- The LMS must have a compete assessment package for secure testing on-line or off-line
- The LMS must be able to set up complete educational programs for the students based upon degree or certificate programs
- The LMS must have an industry standard ePub support for off-line reading of text books
- The LMS must support a competency framework for courses
- The LMS must have course multi-pathing for students to move slower or faster through the course
- The LMS must have basic student registration, grade book, and administrative functions

Part 2 Expected to be delivered in 1H '21

## ESP's Integrated Systems
A fully integrated scalable service

**Social Media/Lead Generator/CRM**
A complete centralized CRM for managing and communicating to students at every phase of their engagement. From lead generation, application, acceptance, student tracking, and alumni engagement.

**Student Experience Applications**
Every student, faculty, and staff can have access to their courses, collaborate with other students, engage with faculty, plan out their course and degree plans all via mobile apps. Students app includes eReader and access to open textbooks and study notes.

**Course Development/Instructional Design**
The ESP system gives faculty access to a rich set of instructional capabilities. This design suite is composed of both our proprietary integration of instructional design as well as third party software to assist in the overall development of classes.

**Analytics/Analysis/Cloud Control**
Integrated analytics at every level, tracking student activity, faculty engagement, with a focus on continuous improvement of student & coursework flow. Sandbox's management will have key indicators with real-time dashboard feedback.



**Virtual School Management & Administration**
Traditional schools use a Student Information System (SIS) as the basis for managing an online or physical school. The VSMA includes an SIS, but it also has much more. Teachers and administration portals to manage and communicate with Students.

**Learning Management System**
A completely adaptable LMS that can be configured to look and feel like any number of different LMS's to support different genres of coursework

**Video Distribution Platform**
The ESP video distribution platform supports live streaming, integrated video conferencing, MOOC and VOD functionality, and content access to any connected device.

**Content Management System**
As online courses grow, managing online content, content library's, open source and licensed textbooks; universities need a proven content management system that maintains access and rights management control.

## Summary
The Educational Services Platform is a fully integrated set of educational services combined into one platform. It delivers a world class student experience through the seamlessly integration of services that go far beyond current systems. This has a fundamental impact on how schools can reach prospective students, the experience they have once they are a student, and the educational experience itself with collaboration, guidance, and many other features.

## Social Media Customer Relationship Management (CRM) system
A fully integrated CRM that tracks the prospective student and their relationships through registration, their student experience, all the way to Alumni relations. The CRM can also track faculty, staff, and extended relationships of students such as their parents, siblings, and friends.

The CRM will:

- Map and manage relationships between students, family members and perspective students
- Track and manage all contacts between school officials and students or perspective students
- Post information to University and student social media accounts (as permitted)
- Monitor (as permitted) social media accounts of students or perspective students as it relates to the university
- Create email and social media campaigns targeted at perspective students

- Manage contacts through integrated calendars
- Integrate contact events with the integrated calendars
- Student lifecycle management view (prospect to alumni)
- Common integrated gradebook seamlessly integrated into the LMS/SIS/Records

## Analytics Framework

Built in throughout the ESP is a complete analytics framework, the framework will:

- Track and count all required events regarding
  - Students
  - Courses
  - Facility
  - Business Partners
- Provide multiple secure configurable analytic dashboards

## Virtual School Management and Administration

In most educational systems, this component is called the Student Information System (SIS). While the SIS is a part of this component there is much more. This system allow the school and students to audit and track degrees and degree options, generates student schedules and recommends future registration of classes.

This system will include:

- Student School Registration
- Financial aid module integration (US Implementation only, may affect pricing)
- Payment Processing
- Student Records Management
- Program Management
- Student Schedule Management
- Official degree audit
- Transfer School Management
- Official Transcripts

## Learning Management System

The Learning management System (LMS) inside of the NuCampus ESP in unique in several ways. First, it is configurable so that it can "look and feel" differently for different colleges and courses while still maintaining complete and full integration with the system. Second, it has advanced modules that can greatly enhance it beyond current LMS's such as the Video distribution system, content management system, and student experience application integration.

The LMS includes:

- A complete assessment system, tests, quizzes, continuous assessment, assessment databases are all included.
- A course development module

- A faculty portal for course management and control
- Faculty tracking of all student progress, and analytics
- A faculty portal for assessment development and control
- Student portal summarizing all courses being taken
- Course portals with progress tracking and saving of "where you left off" in the curriculum
- "Common Cartridge" import support
- Implement IWU discipleship content toggling (on/off capability)

## Video Distribution Platform

The LMS can also include a full video distribution platform that can contain recordings of lectures, live streaming of lectures, content protection (video cannot be copied), and much more.

The Video Distribution System will include:

- A video on demand system to hold course video content of all forms
- A content protection system so that the video is distributed only to those who have licensed it and ensure that it cannot be copied
- A video management system
- An integrated video conferencing system
- A faculty control portal for collaboration, video conferencing study groups, Q&A sessions, etc,

## Student Experience Application

The student experience application is the student side of the complete integration of the ESP for the student.

The Student Experience application will include:

- Student Degree Audit
- Degree (What if tool)
- Course Recommendation Engine
- Student video conferencing (with faculty – *students*)
- Student activity natural language search tool
- Online White board Integration
- Offline course capability for online courses

## Content Management System (CMS)

The content management system will control and manage all the digital assets of the system. The CMS will include:

- Blog management
- Deep Dive management
- Resource Reference management
- Video management
- Image management

- Document Management
- Web Reference management

## Course Development & Instructional Design System

These are all the components included in the course development module:

- Course Creation Tool
- Course Editor Tool
- Course Review Workflow
- Course Versioning
- Course Content Management Object Integration
- Course Preview Creation Tool
- Course Multiple-pathing Support for fast tracking or remedial support
- Support for integrating "in content" quizzes or tests
- Fully Integrated with all systems
- Publishing to common cartridge for use in other LMS's

## Integration Services Framework

The ESP system will include easy integration interfaces so that it can support other third party integrations:

- REST API interface for all system functions
  - Student Registration
  - Course Registration
  - Payments
  - Course Creation
  - Marketplace Submission
  - Content Management Object Management
  - Etc.



## The ESP Marketplace
A marketplace where students, businesses, and faculty can interact



The Marketplace is where businesses, faculty, and students can explore, preview, and join the Sandbox College!

**Businesses** can configure and specify degree requirements that meet their needs, add courses taught by their own "faculty", and register groups of their own corporate students.

**Students** can explore job related degree options, start taking a trial course, and connect with faculty!

**Faculty** can register and start developing courses immediately. They can apply for inclusion into college programs and other certifications.

### Marketplace

The ESP Marketplace is the front portal where all students, partner companies, and prospective faculty can enter and participate in the University.

- Students can explore the University offerings
- Students can find and take courses
- Students can pay for courses
- Faculty and Business Partners can sell courses
- Faculty and Business Partners can buy courses
- Schools and Businesses and register as partners for access to Integration Services

### ESP Partner Module

The partner module allows the University to partner with businesses, government, and other schools to customize the offering as needed. Businesses can fully white-label the university offering and integrate their own courses alongside the university coursed for customized certifications and degrees. Some of the features of the ESP Partner Module are:

- White labeling of the university experience with any other partner
- Customized white labeled apps in the apps stores for all devices
- Custom marketing and control of the white labeling by the partner
    - The partner can control the marketing
    - The university controls the academics
- Implement IWU "Talent Ladder" components

## ESP Platform Universal Features

The ESP system will have industry standard or better implementations throughout.

- GDPR support (Data protection standards)
- Student record data encryption with student-controlled data access with two-factor authentication
- Codeless implementation (a world-class implementation)
- Mobile Phone App for all key features

**Schedule B – ESP Support Plan**

The objective of the support plan is to offer timely and effective support to minimize any downtime or disruption of service.

## Training

Ole will provide training at N&G facilities and N&G will reimburse for costs related to travel related expenses.  This would include system onboarding, administration, and content/course development to be completed by December 1, 2020.

## Web Based Support System

Description.  OLE will provide to N&G a web-based system ("Support System") for technical twenty-four (24) hours per day, seven (7) days per week, three-hundred-sixty-five (365) days per year.  Technical Support will include any research and resolution activity performed by OLE. Support will include:
1)  Assistance related to questions on the operational use of the Service;
2)  Assistance in identifying and verifying the causes of suspected errors; and
3)  Correcting and/or providing workarounds for identified errors or malfunctions, where reasonably available to OLE.

## Tier Level Definitions

1)  **Tier Zero**.  Tier Zero Support refers to "self-help" in the form of online FAQ documentation that allow for end-users (customers) to access and resolve questions and problems on their own, rather than to have to contact a Helpdesk or Service Desk for resolution.  OLE will provide basic FAQ documentation to N&G for this purpose.

2)  **Tier One**. Tier One support is defined as the front-end first level of basic support to students.  It is provided directly by N&G, who shall use the Support System to receive and document customer problem reports.  N&G shall use the Support System to gather and record the customer's information and to determine the customer's issue by analyzing the symptoms and figuring out the underlying problem.  N&G shall use this information to diagnose the nature of the problem and follow the problem resolution diagnostic documentation and support tree (provided by OLE).  The majority of customer problems should be resolvable by N&G provided Tier One Support.  Should the problem not be resolvable by N&G, the problem report ("Ticket") may be escalated by N&G to Tier Two status, which automatically directs the issue to OLE, along with N&G's assessment of urgency.

3)  **Tier Two**.  Tier Two support is a direct request from N&G to OLE for assistance in resolving a problem.  That problem may originate at N&G or may be an escalated problem that started with a customer problem report.  OLE works directly with N&G to resolve such problems, and does not interact with N&G customers.

4)  **Tier Three**.  Tier Three support happens when OLE's first line Technical Support responders need to escalate a problem report to the most senior OLE support staff.

## Documenting Problems:  The Support System creates an ongoing record of the reported question, problem or request, as well as ongoing or completed efforts to resolve the issue.

## Requesting Support:

1)  All support requests must be made using the Web-Based Support system.
2)  Only authorized N&G Technical Support personnel may request Technical Support. N&G will ensure that only persons properly trained in the operation and usage of the Service will utilize the Support.
3)  Emergency Requests:  Support requests marked as urgent will automatically generate an Emergency SMS message to designated OLE Technical Support staff. The OLE Technical Support staff shall evaluate and prioritize the request Problem Severity Level indicated by the requestor.  In

Emergencies, OLE will contact the person who reported the issue directly, via online chat (Skype or similar), or other means, as mutually agreed by the Parties for further discussion.

4) Non-Emergency Requests:  Non-Emergency Technical Support requests will be prioritized by OLE and scheduled for resolution during normal OLE business hours, Monday through Friday, from 9:00 A.M. to 5:00 P.M, USA Central Standard Time, excluding public holidays.

   a) Prioritization:  OLE is solely responsible for problem resolution prioritization.  Depending upon the severity and urgency of the issue, OLE will assign the resources it deems appropriate to appropriately resolve the issue in a timely manner.

   b) One-On-One Non-Emergency Phone Support is available up to ten-hours per week.  N&G can purchase additional one-on-one hours at the applicable rates.  Telephone service one-on-one service requests can be placed 5 days a week, Monday through Friday, from 9:00 A.M. to 5:00 P.M, USA Central Standard Time, excluding public holidays.

   c) Exclusions.  OLE shall have no obligation to:
      i) Support the Service used otherwise than in accordance with this agreement.
      ii) Correct errors caused by the N&G's negligence or other causes beyond the reasonable control of OLE.
      iii) Support 3rd Party software or applications that are not already integrated with the Service and, by extension, the N&G Service.

   d) Unsupported Issues.  In the event that OLE responds to the N&G's support request and the issue encountered by N&G is determined to be outside the scope of OLE's obligations under this Agreement and exhibit, then OLE reserves the right to invoice N&G for OLE's time, materials used and travel expenses and any other reasonable expenses incurred by OLE in diagnosing and identifying such Problem. OLE's time shall be invoiced at OLE's standard rates applicable at the time such services are rendered, depending on type of service required.

5) Technical Support Response Time Goals

   a) OLE shall use commercially reasonable endeavors to provide an initial response to a support request and use commercially reasonable endeavors to correct the issue by providing an individual patch, work around, maintenance release, or taking such other action as OLE deems necessary to correct or work around the issue.

   b) Tier One:  These issues are handled directly by N&G and are generally basic questions related to the service or other issues that N&G can itself resolve without escalation to OLE.

   c) Tier Two:  These are issues for which N&G is not able to resolve:
      i) Limited and non-critical, non-emergency issues.  This Problem Severity Level is associated with: (a) minor and / or limited interruption of customer's use of a non-critical function of the Services.  These issues are escalated by N&G to OLE and are managed and resolved by OLE's first line Technical Support responders
         (1) Request Response Time.  8 hours.
         (2) Request Resolution Time.  With updates on progress every 24 hours until resolved.
      ii) Significant, ongoing issues.  This Problem Severity Level is associated with significant and / or ongoing interruption of customer use of a critical function of the Services.
         (1) Request Response Time.  1 hour.
         (2) Request Resolution Time.  With updates on progress every 4 hours until resolved.

   d) Tier Three:  These are critical or emergency issues that OLE's first line Technical Support are not able to directly resolve.
      i) Severe, Critical or Emergency Issues.  This Problem Severity Level is associated with: (a) Services, as a whole, are non-functional or are not accessible; (b) unauthorized exposure of all of part of N&G Data; or, (c) loss or corruption of all or part of N&G Data.
         (1) Request Response Time.  30 minutes.
         (2) Request Resolution Time.  2 hours.

**Schedule C – Country License List**

Per Section 1.3 of this agreement, OLE agrees to align to N&G international growth priorities and will respond to timing and implementation when N&G provides the priority list. N&G priority alignment will and priority listing will be in effect for a full year from the signing of this agreement. No alignment will be considered binding until an amendment to this agreement is signed.

The following is the approved country list:

| Approved Country | License Type | Country Readiness Plan | Amendment Signed |
|---|---|---|---|
| **United States**[i] | Admin & Content | N/A | N/A |
| **Ethiopia** | ESP Deployment | YES | N/A |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

---

[i] The license for the United States in this agreement covers the right to use the ESP solely in connection with the licensed country of Ethiopia. That includes content development and administrative functions.

 

AMENDMENT OF AGREEMENT

January 28, 2021

Nancy D. Schoonmaker, Vice President for Business Affairs & CFO
Cc: Dr. Matt Lucas, Chancellor IWU National & Global
Indiana Wesleyan University
4201 S Washington St,
Marion, IN 46953

Dear Nancy,

This Letter of Amendment to our Agreement is intended to document and be a binding addition to our Educational Services Platform Strategic Development, Licensing & Cooperation Agreement effective April 15th of 2020.

This Amendment is in support the GEER Grant offering, in Indiana, that will use the Educational Services Platform.  For the past two months, Olé Holdings (OLE) has focused on getting the Educational Services Platform (ESP) ready for teacher training in Indiana under the GEER Grant. We are excited to see that that all is ready for launch, both in the platform and in the development of coursework.

**Principles of this Amendment of Agreement**

This Amendment of Agreement updates Schedule B and C of the original agreement. Schedule B now includes a Service Level Agreement (SLA) that is a pass-through of the AWS SLA. Schedule C is amended to include Indiana GEER Grant students under the license of the agreement.

The attached updated Schedule B and Schedule C attached to this letter will now replace those from the original agreement. There are no changes to the agreement itself implied in this letter except as it relates to how the costs of hosting and development and the collection of student payments are covered as mentioned below.

**Hosting & Development Cost for the GEER Grant Coursework**

As of January 4th of 2021, OLE has been hosting two environments for IWU in AWS; the live production environment for GEER Grant students and the ongoing development environment in which new courses and features are tested and added. OLE will continue to host these two environments in AWS until a mutually-agreeable alternative plan can be established. The projected monthly cost for hosting and required insurance will be approximately $5,000.00 per month and will be billed according to section 3.1.c of the MSA. Costs in setting up the hosting environment in January have totaled approximately $10,000.00 and will not be recurring.

Development costs directly associated with the GEER Grant launch will be absorbed into the overall development for the Ethiopia and will not be billed to IWU incrementally. These costs would normally fall under section 3.1.b, but these are waived in light of our current operating partnership. Olé Holdings will fully repay all development cost upon receipt of funds from Ethiopia.

**Collection of Student Payments**

OLE will collect credit card payments from students who enroll in the GEER Grant coursework through its payment processor. Payment collections will include the cost of the course plus a credit card processing fee, equivalent to 2.45% of the total transaction. OLE will remit to University the tuition from the course, minus .45% and $.30 per transaction to cover the remaining portion of the credit card processing fees assessed by Braintree, OLE's processor. All financial disbursements shall occur within thirty (30) days of the start of each course.

We are excited to see what this collaboration means to our future collaboration for the Kingdom!

Sincerely offered and accepted by:

DocuSigned by:

*Dalen Harrison*

07E4BBB8B599407...

Dalen Harrison, CEO
Olé Holdings, Inc.
Date: 02/12/21

DocuSigned by:

*Nancy D. Schoonmaker*

D682647CE51647F...

Nancy D. Schoonmaker
Executive Vice President & CFO
Date: 02/15/21

**Schedule B – ESP Support Plan + Service Level Agreement**

The objective of the support plan is to offer timely and effective support to minimize any downtime or disruption of service.

## Web Based Support System

Description.  OLE will provide to IWU a web-based system ("Support System") for technical twenty-four (24) hours per day, seven (7) days per week, three-hundred-sixty-five (365) days per year.  Technical Support will include any research and resolution activity performed by OLE. Support will include:
1) Assistance related to questions on the operational use of the Service;
2) Assistance in identifying and verifying the causes of suspected errors; and
3) Correcting and/or providing workarounds for identified errors or malfunctions, where reasonably available to OLE.

## Tier Level Definitions

1) **Tier Zero**.  Tier Zero Support refers to "self-help" in the form of online FAQ documentation that allow for end-users (customers) to access and resolve questions and problems on their own, rather than to have to contact a Helpdesk or Service Desk for resolution.  OLE will provide basic FAQ documentation to IWU for this purpose.

2) **Tier One**. Tier One support is defined as the front-end first level of basic support to students.  It is provided directly by IWU, who shall use the Support System to receive and document customer problem reports.  IWU shall use the Support System to gather and record the customer's information and to determine the customer's issue by analyzing the symptoms and figuring out the underlying problem.  IWU shall use this information to diagnose the nature of the problem and follow the problem resolution diagnostic documentation and support tree (provided by OLE).  The majority of customer problems should be resolvable by IWU provided Tier One Support.  Should the problem not be resolvable by IWU, the problem report ("Ticket") may be escalated by IWU to Tier Two status, which automatically directs the issue to OLE, along with IWU's assessment of urgency.

3) **Tier Two**.  Tier Two support is a direct request from IWU to OLE for assistance in resolving a problem.  That problem may originate at IWU or may be an escalated problem that started with a customer problem report.  OLE works directly with IWU to resolve such problems, and does not interact with IWU customers.

4) **Tier Three**.  Tier Three support happens when OLE's first line Technical Support responders need to escalate a problem report to the most senior OLE support staff.

## Documenting Problems:  The Support System creates an ongoing record of the reported question, problem or request, as well as ongoing or completed efforts to resolve the issue.

## Requesting Support:

1) All support requests must be made using the Web-Based Support system.
2) Only authorized IWU Technical Support personnel may request Technical Support. IWU will ensure that only persons properly trained in the operation and usage of the Service will utilize the Support.
3) Emergency Requests:  Support requests marked as urgent will automatically generate an Emergency SMS message to designated OLE Technical Support staff. The OLE Technical Support staff shall evaluate and prioritize the request Problem Severity Level indicated by the requestor.  In Emergencies, OLE will contact the person who reported the issue directly, via online chat (Skype or similar), or other means, as mutually agreed by the Parties for further discussion.
4) Non-Emergency Requests:  Non-Emergency Technical Support requests will be prioritized after mutual consultation between  OLE and IWU and will be scheduled for resolution during normal OLE business hours, Monday through Friday, from 9:00 A.M. to 5:00 P.M, USA Central Standard Time, excluding public holidays.

a) Prioritization: OLE and IWU will mutually prioritize problem resolution. Depending upon the severity and urgency of the issue, OLE and IWU will mutually agree to assign resources to appropriately resolve the issue in a timely manner.

b) One-On-One Non-Emergency Phone Support is available as an hourly billable option. Such one-on-one hours will be measured in minimum increments of 30 minutes, and are for tech support only. IWU can purchase additional one-on-one hours at the applicable rates. Telephone service one-on-one service requests can be placed 5 days a week, Monday through Friday, from 9:00 A.M. to 5:00 P.M, USA Central Standard Time, excluding public holidays.

c) Exclusions. OLE shall have no obligation to:

   i) Support the Service used otherwise than in accordance with this agreement.

   ii) Correct errors caused by the IWU's negligence or other causes beyond the reasonable control of OLE.

   iii) Support 3rd Party software or applications that are not already integrated with the Service and, by extension, the IWU Service.

d) Unsupported Issues. In the event that OLE responds to the IWU's support request and the issue encountered by IWU is determined to be outside the scope of OLE's obligations under this Agreement and exhibit, then OLE reserves the right to invoice IWU for OLE's time, materials used and travel expenses and any other reasonable expenses incurred by OLE in diagnosing and identifying such Problem. OLE's time shall be invoiced at OLE's standard rates applicable at the time such services are rendered, depending on type of service required.

5) <u>Technical Support Response Time Goals</u>

a) OLE shall use commercially reasonable endeavors to provide an initial response to a support request and use commercially reasonable endeavors to correct the issue by providing an individual patch, work around, maintenance release, or taking such other action as OLE deems necessary to correct or work around the issue.

b) Tier One: These issues are handled directly by IWU and are generally basic questions related to the service or other issues that IWU can itself resolve without escalation to OLE.

c) Tier Two: These are issues for which IWU is not able to resolve:

   i) Limited and non-critical, non-emergency issues. This Problem Severity Level is associated with: (a) minor and / or limited interruption of customer's use of a non-critical function of the Services. These issues are escalated by IWU to OLE and are managed and resolved by OLE's first line Technical Support responders

   (1) <u>Request Response Time</u>. 8 hours.

   (2) <u>Request Resolution Time</u>. 24 hours.

   ii) <u>Significant, ongoing issues</u>. This Problem Severity Level is associated with significant and / or ongoing interruption of customer use of a critical function of the Services.

   (1) <u>Request Response Time</u>. 1 hour.

   (2) <u>Request Resolution Time</u>. 4 hours.

d) Tier Three: These are critical or emergency issues that OLE's first line Technical Support are not able to directly resolve.

   i) <u>Severe, Critical or Emergency Issues</u>. This Problem Severity Level is associated with: (a) Services, as a whole, are non-functional or are not accessible; (b) unauthorized exposure of all of part of IWU Data; or, (c) loss or corruption of all or part of IWU Data.

   (1) <u>Request Response Time</u>. 30 minutes.

   (2) Request Resolution Time. 2 hours.

SERVICE LEVEL AGREEMENT (SLA)

Hosted Training Platform (ESP) Services will achieve System Availability (as defined below) of at least 99.9% during each calendar year. This is based upon AWS's SLA which can be passed along to IWU. "System Availability" means the number of minutes in a year that the key components of the ESP Services are operational as a percentage of the total number of minutes in such year, excluding downtime resulting from (a) scheduled maintenance, (b) events of Force Majeure in the AWS Agreement), (c) malicious attacks on the system, (d) issues associated with the Customer's computing devices, local area networks or internet service provider connections, or (e) inability to deliver services because of acts or omissions of Customer or any Identity Cube user. OLE reserves the right to take the Service offline for scheduled maintenance for which Customer has been provided reasonable notice and OLE reserves the right to change its maintenance window upon prior notice to Customer.

If OLE fails to meet System Availability in the year, upon written request by Customer within 30 days after the end of the year, OLE will issue a credit in Customer's next invoice in an amount equal to 1% of the yearly fee for the affected Services for each 1% loss of System Availability below stated SLA per Service, up to a maximum of the Customer's fee for the affected Services. If the yearly fee has been paid in advance, then at Customer's election OLE shall provide a credit to Customer to be used for additional term extension. The remedy stated in this paragraph is Customer's sole and exclusive remedy for interruption of Services and OLE's failure to meet System Availability.

**Schedule C – Country License List**

Per Section 1.3 of this agreement, OLE agrees to align to IWU international growth priorities and will respond to timing and implementation when IWU provides the priority list. IWU priority alignment will and priority listing will be in effect for a full year from the signing of this agreement. No alignment will be considered binding until an amendment to this agreement is signed.

The following is the approved country list:

| Approved Country | License Type | Country Readiness Plan | Amendment Signed |
|---|---|---|---|
| **United States**[i] | Admin & Content | N/A | N/A |
| **Ethiopia** | ESP Deployment | YES | N/A |
| **United States** | GEER Grant Hosting | YES (several checklists) | YES |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

---

[i] The license for the United States in this agreement covers the right to use the ESP solely in connection with the licensed country of Ethiopia. That includes content development and administrative functions.